## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| CITY OF ROCHESTER, NEW YORK, individually and on behalf of others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> OSHKOSH CORPORATION, PIERCE MANUFACTURING, INC., REV GROUP, INC., E-ONE, INC., ROSENBAUER AMERICA LLC, FIRE APPARATUS MANUFACTURERS' ASSOCIATION, <br><br> Defendants. | **CASE NO.** <br><br> **CLASS ACTION COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

**TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................. 1

II. PARTIES .............................................................................................................. 5

    A. Plaintiff City of Rochester, New York.................................................... 5

    B. Defendants ............................................................................................... 6

        1. Oshkosh Defendants ................................................................... 6

        2. REV Group, Inc............................................................................ 7

        3. Rosenbauer America LLC ........................................................... 8

        4. Fire Apparatus Manufacturers' Association ........................................... 9

III. JURISDICTION AND VENUE........................................................................ 10

IV. FACTUAL ALLEGATIONS............................................................................ 11

    A. The Relevant Fire Apparatus Market, Fire Apparatus Industry, and Manufacturer Defendants' Market Power........................................................ 11

    B. Manufacturer Defendants Acquired Market Dominance ................................. 15

        1. Oshkosh Defendants ................................................................. 15

        2. REV Group ............................................................................... 17

        3. Rosenbauer................................................................................ 18

        4. The Cumulative Effect of Acquiring Market Dominance ..................... 18

    C. Defendants Chose Unlawful Coordination Over Competition.......................... 19

    D. FAMA's Role in Manufacturing Defendants' Exchange of Competitive Information .................................................................................. 21

    E. Defendants' Conspiracy Inflated the Price of Fire Apparatus Above Normal Competitive Levels and Drove Manufacturer Defendants' Margins and Revenues to Historic Highs .................................. 25

    F. Defendants' Concealed the Conspiracy ......................................................... 27

V.     CLASS ACTION ALLEGATIONS ................................................................................ 28

VI.     CLAIMS FOR RELIEF .......................................................................................... 32

COUNT ONE — VIOLATION OF THE SHERMAN ACT – CONSPIRACY TO
       RESTRAIN PRODUCTION AND FIX PRICES ........................................................ 32

COUNT TWO — VIOLATION OF THE SHERMAN ACT – EXCHANGE OF
       COMPETITIVE INFORMATION ................................................................. 33

COUNT THREE — VIOLATION OF NEW YORK GENERAL BUSINESS
       LAWS § 340 ...................................................................................................... 34

COUNT FOUR — UNJUST ENRICHMENT .......................................................................... 35

VII.     PRAYER FOR RELIEF ......................................................................................... 36

VIII.     DEMAND FOR JURY TRIAL .................................................................................. 37

Plaintiff the City of Rochester, New York ("Rochester"), by and through its undersigned attorneys of record, brings this Complaint against Defendants Oshkosh Corporation ("Oshkosh"), REV Group, Inc. ("REV Group"), E-ONE, Inc. ("E-ONE"), Rosenbauer America LLC ("Rosenbauer"), and Fire Apparatus Manufacturers' Association ("FAMA") (together "Defendants"), upon personal knowledge as to their actions and upon information and belief as to Defendants' actions, allege as follows:

## I.    INTRODUCTION

1.     A handful of companies control between 70 and 80 percent of the fire truck market in the United States. Instead of competing, they have chosen to abuse their collective power in the market, and collude to increase prices and restrain supply, extending delivery timelines to generate remarkable profits at the expense of the fire departments, municipalities, and the taxpayers who depend on the lifesaving emergency equipment Defendants manufacture.

2.     These companies' anticompetitive behavior has been perpetuated through their involvement in Defendant Fire Apparatus Manufacturers' Association. Defendants Oshkosh Corporation, REV Group, Inc., E-ONE, Inc., and Rosenbauer America LLC (together, "Defendants") have caused Plaintiff and others similarly situated to pay artificially inflated prices they would not have paid in a normal competitive market and to wait longer than necessary for critical fire emergency apparatus: the vehicles used by fire departments to do their essential work, commonly and collectively referred to as "fire trucks."

3.     The consequences of Defendants' unlawful conduct are clear and dangerous. Outdated and obsolescent emergency fire apparatus are still deployed years after they should have been retired, because Defendants intentionally delay the delivery of new equipment even after it

is ordered.[1] Older trucks and emergency equipment break down more often and are harder to maintain—if and when one fails, and if no replacement is readily available, the gap is not an administrative inconvenience but a threat to public safety. Communities that have managed to procure new fire apparatus have often done so only by cutting costs elsewhere, diverting resources from other services and programs to pay inflated prices that ordinary competition would not have permitted.

4.      While fire departments have struggled to afford and obtain the apparatus they need to protect their communities, Defendants have celebrated the financial results of their unlawful conduct. For example, in 2022, as delivery backlogs stretched to record lengths, Oshkosh's CEO boasted to investors about their "leading market share" and a backlog "at an all-time high up more than 80% compared to the prior year."[2] In early 2025, Oshkosh reported a *$6.3 billion* backlog, telling investors that it "continues to provide excellent visibility."[3]

5.      In early 2025, Oshkosh's CEO, John Pfeifer, explained during an earnings call that Oshkosh's "biggest backlog" was "in municipal fire trucks," that there had been "a significant surge in investment in things like municipal fire trucks" and that Oshkosh sought to bring down the three-year backlog down to "about 18 months."[4] Pfiefer further explained that, "As we do that,

---

[1] *See* Letter from Sen. Elizabeth Warren & Sen. Jim Banks to Edward A. Kelly, Gen. President, Int'l Ass'n of Fire Fighters (Apr. 15, 2025), https://www.nationalspecialdistricts.org/files/161eb8c9e/L.+Fire+Truck+-+Congress+5.25.pdf.

[2] *OSK Q3 2022 Earnings Call Transcript*, TICKERTRENDS (2022), https://tickertrends.io/transcripts/OSK/Q3-earnings-transcript-2022.

[3] *Q1 2025 Earnings Update*, OSHKOSH CORP., 3 (Apr. 30, 2025), https://investors.oshkoshcorp.com/media/document/bba07cba-86c3-4347-a939-354083f65f55/assets/Q1_2025_Earnings_Slides_FINAL.pdf.

[4] John Pfeifer, CEO, Oshkosh Corp., *Citi's Global Industrial Tech and Mobility Conference 2025*, STOCK ANALYSIS (Feb. 19, 2025), https://stockanalysis.com/stocks/osk/transcripts/314729-citi-s-global-industrial-tech-and-mobility-conference-2025/.

that drives really healthy growth and margin creation for our company."[5] By the end of 2025, Oshkosh's fire apparatus backlog had increased to $6.6 billion.[6]

6.     As of October 2025, REV Group reported a backlog of approximately $4.2 billion, requiring customers to wait two to two and a half years for a fire truck.[7] During a 2024 earnings call, REV Group's CFO noted how backlogs benefit REV Group and drive significant shareholder value.[8] But some fire departments report waiting *54 months*—nearly five years—for a new ladder truck.[9]

7.     Defendants' sharp price increases far exceed inflation during the same period, and the long lead times for fire apparatus delivery cannot be explained by COVID-era supply chain issues. It is due to Defendants' anticompetitive coordination and misconduct. According to Edward Kelly, president of the International Association of Fire Fighters, manufacturing and supply chain delays caused by the COVID-19 pandemic "mask[ed]" the "main driver of higher cost and lag time in production: the monopolizing of fire truck and ambulance manufacturing in the United States."[10]

---

[5] *Id.*

[6] *Q4 2025 Earnings Update*, OSHKOSH CORP., 17 (Jan. 29, 2026), https://investors.oshkoshcorp.com/media/document/9e2ac016-ac4c-40b9-9dfd-c6cb60ecf539/assets/Q4_2025_Earnings_Slides_FINAL.pdf.

[7] Amy Campbell, *Transcript of the investor call held by Terex Corporation and REV Group, Inc.*, U.S. SECURITIES AND EXCHANGE COMMISSION, 18 (Oct. 30, 2025), https://www.sec.gov/Archives/edgar/data/97216/000110465925104462/tm2529879d4_425.htm.

[8] *See* Warren & Banks, *supra* note 1, at 4.

[9] David Kroman, *Firetruck Fleet Aging Faster Than Seattle Can Make Repairs*, GOVTECH (Apr. 2, 2024), https://www.govtech.com/em/disaster/firetruck-fleet-aging-faster-than-seattle-can-make-repairs.

[10] Mike Baker, Maureen Farrell & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. TIMES (Feb. 17, 2025), https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html.

8. Roughly a decade ago, one of Defendants' typical fire trucks cost between $500,000 and $800,000. Today, their trucks cost between $1 and $1.5 million dollars. Similarly, the price of specialized fire apparatus has jumped from roughly $900,000 about a decade ago to upwards of $2 million today.[11]

9. While prices have surged, delivery timelines have ballooned from roughly 18 months to **more than four years**.[12] On information and belief, that backlog is not merely the byproduct of increased demand or pandemic-era supply chain delays. In reality, it is the result of Defendants' deliberate suppression of supply. Before the global COVID-19 pandemic, REV Group, for example, had a $1 billion backlog in fire apparatus production.[13] By 2024, its backlog had ballooned to $4.2 billion and, according to the International Association of Fire Fighters, wait times for REV Group apparatus had more than quadrupled from one year to 4.5 years.[14]

10. Defendants have shared pricing intelligence that is not widely available to the public, aligned output constraints and, through their involvement with FAMA, have monitored each other's activities to perpetuate their anticompetitive scheme.

11. FAMA convenes annual closed-door meetings where Defendants communicate directly with their so-called competitors. Through their involvement with FAMA, Defendants report sensitive, non-public business and pricing data, which FAMA compiles and redistributes

---

[11] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG BY MATT STOLLER (Jan. 25, 2025), https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.

[12] *See id.* (noting that lead time for new faire truck "has gone from 10-12 months to greater than 2 years in many cases and in some cases approaching 3 years" and that some departments have waited as long as 54 months).

[13] *IAFF calls for federal investigation into soaring apparatus prices*, INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS (May 15, 2025), https://www.iaff.org/news/iaff-calls-for-federal-investigation-into-soaring-apparatus-prices/.

[14] *Id.*

exclusively to its members. Defendants have leveraged this information to boost their profits without fear that their market share will be adversely impacted. Rivals in functioning competitive markets do not share this kind of data—rather, conspirators share such data when they are trying not to meaningfully compete at all.

12. Defendants' anticompetitive behavior has been extraordinarily profitable. Defendants have expanded their profit margins, increased revenues, and insulated themselves from market competition that would ordinarily constrain pricing. Defendants face little threat from new market entrants because capital requirements and other barriers to entry in the relevant market make any new competition unlikely and, in any event, unthreatening.

13. Defendants have treated a captive fire apparatus market as an opportunity to extract higher profits and reward shareholders at the expense of governmental entities like Plaintiff, their fire departments and firefighters, and the communities they serve. The law does not permit Defendants to engage in such an anticompetitive conspiracy at Plaintiff's, Class Members', and their communities' expense.

## II. PARTIES

### A. Plaintiff City of Rochester, New York

14. The City of Rochester ("Rochester") is a municipal corporation organized under the laws of the State of New York. Rochester is located in Monroe County, New York, and has approximately 211,000 residents. The City's principal offices are located at City Hall, 30 Church Street, Rochester, New York, 14614.

15. Since 2019, Rochester has contracted for the purchase of several fire trucks, both directly with REV Group subsidiary E-ONE and through an authorized dealer, Premier Fire

Apparatus, Inc.; as well as at least one fire truck from Rosenbauer through an authorized dealer, Empire Emergency Apparatus.

16. These orders include several different types of apparatus including pumpers, aerials, and rescue units, and total millions of dollars in expenditures. But on information and belief, deliveries of these essential apparatus were and are delayed by Defendants' unlawful scheme, and the prices paid by Plaintiff were increased.

**B.     Defendants**

**1.     Oshkosh Defendants**

17. Defendant Oshkosh Corporation ("Oshkosh") is a Wisconsin corporation and headquartered in Oshkosh, Wisconsin. Its principal executive offices are located at 1917 Four Wheel Drive, Oshkosh, WI 54902. Oshkosh is a publicly traded company (NYSE: "OSK").

18. Oshkosh manufactures and sells a variety of vehicles and equipment under numerous, different brand names.[15] Of the roughly $3 billion in annual fire truck sales in the United States, Oshkosh captures approximately $750 million, or 25% of annual sales in the United States.[16]

19. Defendant Pierce Manufacturing, Inc. ("Pierce") (together with Oshkosh, "Oshkosh Defendants") is a subsidiary of Oshkosh and one of Oshkosh's North American brands. Pierce has its principal executive offices and headquarters located at 2600 American Drive, Appleton, Wisconsin 54912. Pierce manufacturers fire apparatus, including fire trucks, stock

---

[15] *See* Oshkosh Corp., *Annual Report (Form 10-K)* (Feb. 20, 2025) at 3, https://www.investors.oshkoshcorp.com/media/document/cdffc8d8-7620-48f8-9d1a-b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_web.pdf.

[16] Musharbash, *supra* note 11.

trucks, chassis, pumpers, aerials, tankers and rescue units. Pierce has numerous dealerships across the country and sells its products to customers throughout the United States.[17]

20. As alleged in further detail below, Oshkosh Defendants have participated in the conspiracy by, among other things, exchanging competitively sensitive output, pricing, and backlog information with Defendants and through FAMA's data-collection programs and members-only meetings; restricting production capacity below the level necessary to meet demand; and coordinating dealer-territory allocations. Oshkosh Defendants have continued these practices following the public disclosure of the alleged conspiracy and the filing of related antitrust litigation against it.

### 2. REV Group Defendants

21. Defendant REV Group, Inc. ("REV Group") is a Delaware corporation and headquartered in Brookfield, Wisconsin. REV Group's principal executive offices are located at 245 South Executive Drive, Suite 100, Brookfield, Wisconsin 53005. REV Group is a publicly traded company (NYSE: "REVG").

22. REV Group manufactures and sells fire trucks and other emergency vehicles and equipment under numerous different brand names.[18] In the last decade, REV Group has acquired other major fire truck manufacturers, significantly increasing its share of the fire truck manufacturing market in the United States.[19] As of March 2025, REV Group alone controlled approximately 33% of the U.S. fire apparatus market.[20]

---

[17] Find a Dealer, PIERCE MANUFACTURING INC., https://www.piercemfg.com/find-a-dealer.

[18] *See* REV GROUP, https://revgroup.com/ (last visited May 7, 2026).

[19] *See* Warren & Banks, *supra* note 1.

[20] *Id.*

23.     As of February 2, 2026, REV Group became the wholly owned subsidiary of Terex Corporation, a global conglomerate specializing in the emergency services, waste and recycling, utilities, and construction sectors.[21]

24.     Defendant E-ONE, Inc. (together with REV Group, "REV Group Defendants") is a subsidiary of REV Group. E-ONE has its principal executive offices and headquarters located at 1601 SW 37th Avenue, Ocala, Florida 34474. E-ONES manufacturers fire apparatus, including fire trucks, stock trucks, chassis, pumpers, aerials, tankers and rescue units. E-ONE has numerous dealerships across the country and sells its products to customers throughout the United States.

25.     As alleged in further detail below, REV Group Defendants have participated in the conspiracy by, among other things, exchanging competitively sensitive output, pricing, and backlog information with Defendants and through FAMA's data-collection programs and members-only meetings; restricting production capacity below the level necessary to meet demand; and coordinating dealer-territory allocations. REV Group Defendants have continued these practices following the public disclosure of the alleged conspiracy and the filing of related antitrust litigation against them.

### 3.     Rosenbauer America LLC

26.     Defendant Rosenbauer America LLC ("Rosenbauer") is a Delaware limited liability company and a wholly owned subsidiary of Rosenbauer International AG ("Rosenbauer International"), a publicly traded company based in Austria. Rosenbauer is "the holding company

---

[21] News Release, *Terex and REV Group Complete Merger, Creating a Premier Specialty Equipment Manufacturer*, TEREX CORP. (Feb. 2, 2026), https://s203.q4cdn.com/676879669/files/doc_news/TEREX-AND-REV-GROUP-COMPLETE-MERGER-CREATING-A-PREMIER-SPECIALTY-EQUIPMENT-MANUFACTURER-2026.pdf.

for the Rosenbauer Group's North American business."[22] Rosenbauer has offices in Nebraska, South Dakota, and Minnesota.

27.    Rosenbauer is a Delaware company and conducts substantial business throughout the United States, including the transaction of business and sale of fire apparatus to customers in this District.

28.    Rosenbauer manufactures and sells a complete line of fire apparatus, including pumpers, heavy and light rescue vehicles, mobile water tenders, mini pumpers, aerial ladder trucks, aerial platforms, and electric fire apparatus. Rosenbauer has dealerships across the United States and holds itself out as the second-largest fire apparatus manufacturer in the United States.

29.    Rosenbauer reports approximately $250 million in annual U.S. fire apparatus sales, representing nearly 10 percent of the United States fire truck market.[23]

30.    As alleged in further detail below, Rosenbauer has participated in the conspiracy by, among other things, exchanging competitively sensitive output, pricing, and backlog information with Defendants and through FAMA's data-collection programs and members-only meetings; restricting production capacity below the level necessary to meet demand; and coordinating dealer-territory allocations. Rosenbauer has continued these practices following the public disclosure of the alleged conspiracy and the filing of related antitrust litigation against it.

### 4.    Fire Apparatus Manufacturers' Association

31.    Defendant Fire Apparatus Manufacturers' Association is a trade association registered in Virginia and located in Greenwell Springs, Louisiana. Its members include the largest

---

[22] Press Release, *Rosenbauer International fully acquires Rosenbauer America*, ROSENBAUER (June 23, 2022), https://www.rosenbauer.com/en/company/investor-relations/financial-news/2022/06/rosenbauer-international-fully-acquires-rosenbauer-america.

[23] Musharbash, *supra* note 11.

fire truck manufacturers in the United States and their component suppliers. Together, FAMA's members account for approximately seventy to eighty percent of all fire apparatus sales in the United States.

32. As alleged in further detail below, FAMA acted as a knowing facilitator of and co-conspirator in the conduct alleged herein. FAMA provided the institutional infrastructure, data-collection mechanisms, recurring in-person forums, and confidentiality framework through which Defendants coordinated output decisions, monitored compliance with their alleged understandings, and concealed their conduct from purchasers. Notwithstanding the public disclosure of the antitrust allegations against its members and the filing of multiple federal lawsuits, FAMA has continued to operate its data-exchange programs and members-only meetings without material change.

### III. JURISDICTION AND VENUE

33. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1337, because Plaintiff asserts claims under the Sherman Antitrust Act and the Clayton Antitrust Act.

34. The City brings this action on behalf of itself and those similarly situated under Section 4 of the Sherman Act, 15 U.S.C. § 4 *et seq*, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26, for damages, treble damages, and injunctive relief against Defendants for violating Section 1 of the Sherman Act, 15 U.S.C. § 1 *et seq*, by restricting the supply and increasing the price of Fire Trucks.

35. This Court has personal jurisdiction over Defendants, and venue is proper in this District under 28 U.S.C. § 1391(b) and (c), because at least one Defendant resides in this District, is licensed to do business or is doing business in this District, Defendants transact or have transacted substantial business here, a substantial part of the events or omissions giving rise to the

claims occurred here, and a substantial portion of the affected interstate trade and commerce has been carried out here.

36. This Court also has supplemental jurisdiction over the City's state law claims because they "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

## IV. FACTUAL ALLEGATIONS

### A. The Relevant Fire Apparatus Market, Fire Apparatus Industry, and Manufacturer Defendants' Market Power

37. The relevant product market for purposes of this action is the market for fire apparatus, including pumpers, aerial fire apparatus, rescue vehicles, and firefighting vehicles. The relevant geographic market is the United States.

38. Fire apparatus, commonly known as fire trucks, are specialized motor vehicles engineered to perform fire suppression, rescue, and emergency response functions. Fire apparatus also include pumpers (or "engines"), aerial fire apparatus (including straight ladders, platforms, and tower trucks), rescue vehicles, and other rescue and firefighting vehicles.

39. The National Fire Protection Association ("NFPA") promulgates nationally recognized standards defining the minimum requirements for the design, performance, and other criteria for fire apparatus, other emergency vehicles, and related equipment and components.[24]

40. "Fire apparatus" is defined by reference to the standards that govern its design and construction. Apparatus intended for structural and general firefighting use is built to the National

---

[24] *See NFPA 1900: Standard for Aircraft Rescue and Firefighting Vehicles, Automotive Fire Apparatus, Wildland Fire Apparatus, and Automotive Ambulances*, NFPA (2024), https://nfpanorm.com/wp-content/preview/1900%202024.pdf.

Fire Protection Association's NFPA 1900. Wildland fire apparatus, which is primarily used for wildland fire response, is also subject to standards promulgated by the National Wildfire Coordinating Group.

41. There is no reasonable substitute for fire apparatus. Fire departments cannot discharge their public-safety obligations using ordinary consumer trucks, chassis, or other emergency vehicles not engineered to applicable requirements or industry standards.

42. Fire apparatus sold in the United States are engineered to U.S.-specific standards, road and bridge design and weight limits, and equipment configurations. Fire apparatus designed for foreign markets are not interchangeable with U.S. apparatus; for example, European fire apparatus tend to be shorter and narrower due to narrower European streets, whereas the United States tends to have larger, wider roads and highways.

43. Neither the market for foreign fire apparatus nor the market for used fire apparatus meaningfully constrains pricing of new fire apparatus designed and manufactured for sale in the United States.

44. The modern fire apparatus industry in the United States took shape in the decades following the Second World War, as numerous local manufacturers emerged across the country to supply fire departments. "Competition among these smaller firms served to keep fire truck prices near costs, and the existence of a large number of manufacturers ensured there was always plenty of redundant manufacturing capacity to meet demand."[25]

45. For decades, independent manufacturers competed on price, customization, build quality, and lead time. Purchasers had meaningful choice among comparable products, inflation-

---

[25] Musharbash, *supra* note 11.

adjusted prices and price increases were reasonably stable, and overall the fire apparatus industry produced predictable competitive outcomes.

46.     The fire apparatus industry continued to be meaningfully diverse into the early 2000s. Annual sales of new fire apparatus in the United States reached over five thousand units in 2008.[26]

47.     In 2008, the worldwide financial crisis had a substantial effect on demand for fire apparatus because of its impact on municipal budgets. Demand for new fire apparatus likewise decreased. By 2011, U.S. annual sales had declined by roughly 40%.[27] Many independent manufacturers exited the industry, were sold, or were liquidated. Demand did not return to pre-recession levels until the mid-2010s, by which point the industry's structure had been fundamentally altered. The exit and acquisition of independent manufacturers during and after the recession set the stage for the consolidation of the U.S. fire apparatus market.

48.     Today, the fire apparatus market in the United States is dominated by a small number of manufacturers: Oshkosh, Pierce, REV Group, E-ONE, and Rosenbauer (the "Manufacturer Defendants"). Together, the Manufacturer Defendants sell fire apparatus to fire departments and municipalities in all fifty states. Their sales account for approximately 70 to 80 percent of the U.S. fire apparatus unit sales.[28]

---

[26] Paul C. Darley, *The Fire Apparatus Market is coming back…Just look at the Data*, FAMA (Dec. 4, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/.

[27] *Id.*

[28] Baker, Farrell & Kovaleski, *supra* note 10.

49. Fire apparatus are a long-lifecycle good and, unlike in the consumer automobile industry, fire departments typically replace fire apparatus every ten to fifteen years.[29] Fire departments expect fire apparatus to remain in service for that period of time.

50. Demand for fire apparatus is stable and forecastable. Fire departments must replace aging apparatus based on their service life. Worn or obsolete apparatus cannot safely perform front-line emergency functions. Departments cannot defer replacement indefinitely without compromising public safety. Thus, demand for new fire apparatus does not meaningfully decline in response to price increases.

51. Buyers of fire apparatus are fragmented and structurally disadvantaged relative to the Manufacturer Defendants. Purchasers are overwhelmingly governmental entities such as municipal governments, fire districts, and county governments. No single buyer accounts for a meaningful share of national demand.

52. Today, even the largest buyers of fire apparatus face the same reality: manufacturer Defendants account for approximately 70 to 80 percent U.S. fire apparatus unit sales. That reality means that governmental entities like Plaintiff cannot escape Manufacturer Defendants' coordinated and artificially inflated prices. Buyers of fire apparatus lack the resources to develop alternative supply sources on their own.

53. Entry into the fire apparatus market is exceedingly difficult. Among other things, a new market entrant wishing to compete with the likes of the Manufacturer Defendants would have to commit capital in the tens of millions, if not hundreds of millions of dollars, to simply acquire or build manufacturing facilities capable of producing heavy vehicles to the exacting specifications for fire apparatus. Similarly, large capital outlays would be required to design and test new fire

---

[29] *Id.*

apparatus, ensure regulatory compliance, and build a national dealer and service network capable of supporting buyers throughout the multi-decade service life of their fire apparatus. These barriers have insulated the Manufacturer Defendants from new competition in the fire apparatus market.

54. Smaller fire apparatus manufacturers that remain in the market do not meaningfully constrain the Manufacturer Defendants' pricing or output decisions. Fringe producers lack the manufacturing scale, dealer-network reach, product breadth, and procurement-qualification track record necessary to take significant share. Many specialize in narrow segments, such as wildland or smaller-municipality apparatus, and do not compete across the Manufacturer Defendants' full product range. Their collective share is insufficient to discipline the Manufacturer Defendants' coordinated anticompetitive conduct.

55. The Manufacturer Defendants possess market power in the U.S. fire apparatus market. They have the ability to, and have in fact, artificially inflated prices above normal competitive levels and restricted output below competitive levels to boost their profits.

**B.      Manufacturer Defendants Acquired Market Dominance**

56. The historic disruption of the 2008 global financial crisis created an opening for consolidation and the Manufacturer Defendants seized it, absorbing many other fire apparatus manufacturers across the United States.

### 1.      Oshkosh Defendants

57. Oshkosh's fire apparatus operations are anchored largely by its primary subsidiary in North America, Pierce, which is among the largest single fire apparatus brands in the United States. Oshkosh expanded Pierce's reach through targeted acquisitions of other fire apparatus companies. In 2021, Pierce acquired Boise Mobile Equipment ("BME"), an Idaho-based

manufacturer.[30] The BME acquisition expanded Pierce's product portfolio into wildland-specific apparatus and amplified its presence in West Coast markets.

58. In 2022, Oshkosh acquired Maxi-Métal, Inc., a manufacturer of fire apparatus that distributes into both the Canadian and U.S. markets.[31] Together with its existing Pierce operations, the acquisitions of BME and Maxi-Métal gave Oshkosh control of approximately one quarter of the fire apparatus market in the United States.

59. In addition to acquiring other manufacturers, Oshkosh consolidated Pierce's dealer network into exclusive, non-overlapping regions. Pierce's regional dealers have themselves engaged in a series of acquisitions that have eliminated dealer-level competition across most of the United States.[32]

---

[30] *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, OSHKOSH CORP. (Sept. 16, 2021), https://www.investors.oshkoshcorp.com/news/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment/16c54803-9007-4e9e-82f2-e6253396d4e0/.

[31] *Oshkosh Corporation Acquires Maxi-Métal, Inc.*, OSHKOSH CORP. (June 13, 2022), https://www.investors.oshkoshcorp.com/news/oshkosh-corporation-acquires-maxi-metal-inc/c5afbb77-38ec-4497-a391-f4f56b88d127/.

[32] *See, e.g., MacQueen Emergency Group Territory Expanded to Include 109 Missouri Counties*, PIERCE MANUFACTURING INC. (July 10, 2018), https://www.piercemfg.com/pierce/press-release/macqueen-emergency-group-territory-expanded-to-include-109-missouri-counties; *Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior Equipment*, PIERCE MANUFACTURING INC. (Jan. 21, 2020), https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment; *Minuteman Fire and Rescue Acquire by Allegiance Fire and Rescue*, ALLEGIANCE FIRE & RESCUE (Nov. 19, 2019), https://allegiancefr.com/minuteman-fire-and-rescue-acquired-by-allegiance-fire-and-rescue/; *Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment*, PIERCE MANUFACTURING INC. (Sept. 1, 20123), https://www.piercemfg.com/pierce/press-release/pierce-dealer-firematic-supply-co.-grows-presence-in-northeast-with-acquisition-of-churchville-fire-equipment; *Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan*, PIERCE MANUFACTURING INC. (Jun 12, 2025), https://www.piercemfg.com/pierce/press-release/reliant-fire-apparatus-acquires-halt-fire-inc.-expands-pierce-dealership-territory-to-include-the-state-of-michigan.

### 2. REV Group

60. Over several years, REV Group, which now controls approximately thirty percent of the fire apparatus market, acquired numerous other companies—including its competitors.[33] Over time, manufacturers such as E-ONE, a Florida-based manufacturer, and Ferrara Fire Apparatus, Inc., a manufacturer based on Louisiana and a direct competitor of E-ONE, were added to REV Group's portfolio.

61. REV Group continued to acquire other manufacturers. In 2016, it acquired Kovatch Mobile Equipment Corporation ("KME"),[34] another leading manufacturer of fire apparatus and other specialty emergency vehicles, and in 2020, it acquired Spartan Emergency Response, a leading vehicle, cab, and chassis platform manufacturer.[35] That transaction brought four additional fire apparatus industry assets under REV Group's control in a single stroke: Spartan Fire Apparatus and Chassis, Smeal Fire Apparatus, Ladder Tower, and UST.[36]

62. The REV Group told its shareholders the consolidation plan was aimed at increasing profits; while the companies it was acquiring were operating with a profit margin of 4 to 5 percent, and the REV Group told shareholders the plan was "to get all of them above that 10

---

[33] Baker, Farrell & Kovaleski, *supra* note 10.

[34] Marketwired, *REV Group, Inc. Acquires Kovatch Mobile Equipment Corp. ("KME")*, YAHOO FINANCE (Apr. 11, 2016), https://finance.yahoo.com/news/rev-group-inc-acquires-kovatch-202444477.html.

[35] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIRE APPARATUS MAGAZINE (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/.

[36] Newsroom, *REV Group, Inc. Completes Acquisition of Spartan Emergency Response*, BUSINESSWIRE (Feb. 3, 2020), https://www.businesswire.com/news/home/20200203005180/en/REV-Group-Inc.-Completes-Acquisition-of-Spartan-Emergency-Response.

percent level."[37] Today, REV Group alone controls approximately thirty percent of the fire apparatus market in the United States.

### 3. Rosenbauer

63. As REV Group and Oshkosh consolidated their U.S. operations, Rosenbauer moved to consolidate its own. In March 2023, Rosenbauer added IKON Fire, LLC to its dealer network as the exclusive Rosenbauer dealer for Colorado and Wyoming.[38] For more than fifty years, IKON Fire sold and serviced fire apparatus to customers in the Colorado and Wyoming region.[39] And, like its competitors, Rosenbauer assigned its dealers to non-overlapping geographic territories, foreclosing intra-brand competition among its dealers.

### 4. The Cumulative Effect of Acquiring Market Dominance

64. The Manufacture Defendants' targeted acquisition of fire apparatus manufacturers—including companies that had formerly been direct competitors—transformed the fire apparatus industry in the United States from a diverse, decentralized market of independent manufacturers and dealers into a tightly consolidated oligopoly.

65. Today, Manufacturer Defendants control most of the recognizable apparatus brands in the United States, the dealer networks through which those brands reach customers, and the supply of components on which the few remaining independent manufactures depend. The Manufacturer Defendants' efforts to consolidate and achieve market dominance set the stage for their coordinated anticompetitive conduct.

---

[37] Baker, Farrell & Kovaleski, *supra* note 10.

[38] Fire Apparatus*, Rosenbauer Announces New Partnership with IKON Fire, LLC in CO and WY*, Fire Apparatus Magazine (Mar. 27, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/rosenbauer-announces-new-partnership-with-ikon-fire-llc-in-co-and-wy/.

[39] *Id.*

## C. Defendants Chose Unlawful Coordination Over Competition

66. By 2020 the field of fire apparatus manufacturers in the United States had been reduced to only a handful of major players—the Manufacturer Defendants. Such market consolidation invited anticompetitive coordination, and Defendants seized the opportunity to do so.

67. REV Group has told industry analysts that they would substantially raise profit margins and that other companies were doing the same.[40] REV Group has paired that posture with explicit assurances to investors that margins would expand industry-wide. Timothy Sullivan, REV Group's then-CEO, told analysts that the businesses REV Group had acquired historically operated at four to five percent margins and that REV Group was on a path to roughly double that figure and represented to investors and analysts that Pierce and Oshkosh had adopted a similar model.[41]

68. In a market with sustained excess demand, historic backlogs, and historic margins, the Manufacturer Defendants have not added meaningful capacity, have not bid against one another for share, and have not undercut one another on price. REV Group, for example, "spends a small portion of its revenue—about 1 percent—on upgrading its buildings and equipment" despite having a $4 billion backlog in fire apparatus orders.[42]

69. Defendants' anticompetitive conduct cannot be explained as the product of their own independent profit-maximizing strategy. In an ordinary competitive market with sustained excess demand, multi-year backlogs, and historic margins, an independent profit-maximizing firm

---

[40] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html.

[41] *See* Baker, Farrell & Kovaleski, *supra* note 10.

[42] *Id.*

would expand capacity to capture share. The Manufacturer Defendants did the opposite and suppressed the supply of fire apparatus.

70.     In 2021, for example, despite strong demand for fire apparatus, REV Group closed two manufacturing plants, cutting the company's manufacturing by approximately a third. Even before the COVID-19 pandemic, the REV Group had a backlog of roughly $1 billion worth of fire department orders that were expected to take a year to 18 months to fulfill. And by 2024, REV Group's backlog had soared to $4 billion worth of orders that the REV Group estimated it would take two to three years to deliver.[43] Neither Oshkosh nor Rosenbauer expanded their capacity even as their backlogs reached historic levels and their margins climbed in parallel. Instead, Manufacturing Defendants chose to maintain and even increase billions of dollars of backlogs during the Class period.

71.     Manufacturing Defendants' pricing patterns are similarly inconsistent with independent, uncoordinated action. They relied on historic fire apparatus backlogs to justify imposing "floating prices" for fire apparatus. Each Manufacturer Defendant publicly attributed its price increases to the same external causes—supply-chain disruption, inflation, input costs—even after the supply-chain pressures of 2021 and 2022 had resolved and the Federal Reserve Bank of New York's Global Supply Chain Pressure Index had returned to and even below the baseline between 2023 and 2025.[44] Meanwhile, Manufacturer Defendants' prices and backlogs continued to climb through 2024 and into 2025. The persistence of Manufacturer Defendants' price increases after the asserted external justification disappeared is consistent with coordination and inconsistent with independent response to common cost shocks such as the global COVID-19 pandemic.

---

[43] *Id.*

[44] *See Global Supply Chain Pressure Index (GSCPI)*, FEDERAL RESERVE BANK OF NEW YORK (Apr. 2026), https://www.newyorkfed.org/research/policy/gscpi#/interactive.

72. Manufacturer Defendants' parallel capacity restraint, the parallel pricing, the parallel disregard for share-taking opportunities show that the Manufacturer Defendants chose coordination over competition and continue to do so.

**D. FAMA's Role in Manufacturing Defendants' Exchange of Competitive Information**

73. The Fire Apparatus Manufacturers' Association is a closed trade association whose membership is restricted to fire apparatus manufacturers and component suppliers. Membership in FAMA is strictly limited to manufacturers of fire apparatus or manufactures of components incorporated by manufacturers of fire apparatus.[45] The Manufacturer Defendants exercise control over FAMA's membership and governance through multiple corporate entities, including entities they own or control.

74. FAMA's membership includes REV Group Defendants and other Rev Group brands, such as KME, Ferrara, and Spartan; Oshkosh's subsidiary Pierce; Pierce's subsidiary BME, and Rosenbauer.

75. John Schultz, Vice President and General Manager of Pumper Products at Pierce, serves as FAMA's vice-chair and as a member of FAMA's Data & Research Committee. Phil Gerace, the former Director of Sales at E-ONE and current Director of Dealer Development for the Specialty Vehicles Segment for Terex Corporation, serves as chairman and sits on FAMA's Bylaws Committee. Larry Daniels is Vice President of Global Sales at REV Group and serves as chairman of FAMA's Marketing and Trade Shows Committee. Roger Lackore, the Director of Product Development at REV Group and former Director of Product Development at Spartan Emergency Response, serves as chairman of FAMA's Technical Committee.

---

[45] Why Join, *Membership Eligibility*, FAMA, https://www.fama.org/why-join (last visited May 7, 2026).

76. FAMA serves as a forum through which the Manufacturer Defendants regularly exchange highly granular, competitively sensitive information. Through FAMA, Manufacturer Defendants—who control 70 to 80 percent of the fire apparatus market in the United States—not only exchange such information with one another, but obtain information from smaller fire apparatus manufacturers from whom REV Group Defendants, Oshkosh, and Rosenbauer would face competition in a normal functioning market.

77. The data FAMA collects "is reserved exclusively for [its] members."[46] FAMA's Data & Research Committee describes its mission as providing "actionable data" for member companies' "strategic business planning."[47] Such data "includes economic data, fire market trends, and apparatus sales and order statistics."[48]

78. FAMA's data reports are issued on at least a quarterly basis and function as a vehicle for Manufacturer Defendants' coordinated supply and pricing decisions. For years, FAMA's website made clear that only FAMA members that submitted their own data would get access to FAMA's data reports.[49] FAMA stated that access to its data "may be denied" to any company "that was given the opportunity to participate in the program but refused."[50] On

---

[46] *See* Darley, *supra* note 26.

[47] Data & Research Committee, *Mission*, FAMA https://www.fama.org/data-research-committee/ (last visited May 7, 2026).

[48] *Id.*

[49] *See e.g.*, Why Join?, *Added Benefits*, FAMA (Mar. 7, 2018), https://web.archive.org/web/20180307153235/https://www.fama.org/membership/why-join/ ("Only those companies that participate in the statistical studies and members are privy to these reports."); Why Join?, *Added Benefits*, FAMA (Jan. 5, 2019), https://web.archive.org/web/20190105200445/https://www.fama.org/membership/why-join/ (same); Why Join?, *Added Benefits*, FAMA (Sept. 20, 2024), https://web.archive.org/web/20240920171737/https://www.fama.org/membership/why-join/ (same).

[50] Statistics Committee, *Policy Guidelines for Statistical Programs*, FAMA (Apr. 14 2021), https://web.archive.org/web/20210414114946/https://www.fama.org/about-

information and belief, FAMA updated its website to remove such language after the conduct alleged in this complaint came to light and municipalities began bringing suit about it. But archived versions of the pages from FAMA's website are preserved by the Internet Archive's Wayback Machine.

79. The nature and granularity of information FAMA members exchange are a paradigmatic example of trade-association information exchanges that have been recognized as facilitating unlawfully coordinated conduct.

80. FAMA's own marketing identifies the exchange of competitor-specific data as the central benefit of membership. According to FAMA, it "collects a lot of data on fire apparatus sold to the fire service" and such data is "one of the most valuable reasons" to join FAMA."[51] That FAMA itself markets access to competitor data as being among the "most valuable" reasons to join is a telling admission.

81. Plaintiff and other similarly situated purchasers of fire apparatus cannot access the same unit-volume, state-level, and category-specific data that the Manufacturer Defendants obtain from one another through FAMA. The result is a structural information asymmetry: the Manufacturer Defendants collectively control approximately seventy to eighty percent of U.S. fire apparatus unit sales possess detailed, current, member-specific data about the market, while the public bodies that buy from those firms operate without it. This asymmetry has no legitimate procompetitive justification and serves only to advantage the Manufacturer Defendants in their dealings with buyers.

---

fama/committees/statistics/; Data & Research Committee, *Policies*, FAMA (Sept. 20, 2024), https://web.archive.org/web/20240920001257/https://www.fama.org/about-fama/committees/statistics/ (same) .

[51] *See* Darley, *supra* note 26.

82.     In addition to leveraging granular market data, FAMA's Governmental Affairs Committee "[m]onitor[s] and disseminat[es] potential and enacted legislation"[52] as well as other issues concerning or related to governmental entities such as Plaintiff.

83.     Because a significant majority of the fire apparatus market in the United States is controlled by the Manufacturer Defendants, FAMA members' exchange of highly granular competitive information take place in a highly concentrated market. In such a market, such coordination and information sharing has the greatest potential to suppress meaningful market competition.

84.     The data regularly exchanged and disseminated by FAMA to its members is current quarterly data rather than historical data that would meaningly obscure individual member's data.

85.     FAMA data is shared exclusively among competitors and withheld by FAMA from buyers, eliminating any procompetitive efficiency rationale tied to general market transparency.

86.     The exchange of FAMA data is reciprocal and conditioned on continued participation, ensuring that each manufacturer's submission is rewarded with equivalent visibility into its rivals.

87.     The exchange of FAMA data is paired with regular in-person, closed-door gatherings of senior industry personnel, including representatives of Manufacturer Defendants, their subsidiaries, or corporate affiliates.

---

[52] Governmental Affaires Committee, *Objectives*, FAMA, https://www.fama.org/governmental-affairs-committee/ (last visited May 7, 2026).

**E.** **Defendants' Conspiracy Inflated the Price of Fire Apparatus Above Normal Competitive Levels and Drove Manufacturer Defendants' Margins and Revenues to Historic Highs**

88. The price of fire apparatus has roughly doubled during the class period. A standard fire truck that cost approximately $300,000 to $500,000 in the mid-2010s now costs an average of $1 million. Aerial and other specialized fire apparatus that cost $750,000 to $900,000 in the mid-2010s now costs upward of $2 million. Such increases are not explained by inflation alone.

89. Buyers have no meaningful ability to comparison-shop their way out of these prices. The Manufacturer Defendants' market dominance has produced an environment where purchaser confronted with three apparent choices—an E-ONE, a KME, and a Ferrara—is in fact confronting three brands of REV Group which, as noted above, controls roughly thirty percent of the fire apparatus market in the United States.

90. Similarly, Oshkosh and Pierce control approximately one quarter of the market. And Pierce's dealers have themselves engaged in a series of acquisitions that have eliminated dealer-level competition across most of the United States. Rosenbauer, too, foreclosed intra-brand competition among its dealers by assigning non-overlapping geographic territories to its various dealers. Fire departments across the country have little practical alternative but to pay the prices the Manufacturer Defendants charge.

91. The Manufacturer Defendants have layered a second mechanism of price increases: "'floating' price" clauses, or contract terms that permit the manufacturer to raise the final price of an apparatus after production begins.[53] Because delivery to the buyer could take years after the

---

[53] Press Release, *Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing*, JIM BANKS U.S. SENATOR FOR INDIANA (Apr. 15, 2025), https://www.banks.senate.gov/news/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing/.

original order was placed, Manufacturer Defendants impose price increases years after the buyer placed the order, when the buyer has already committed budgeted funds and has no practical ability to walk away.

92. For example, Rosenbauer's president, Mark Fusco, publicly acknowledged that Rosenbauer imposes "surcharges that might occur during the build times" on customers.[54] Fire departments have been charged $100,000 more than the agreed purchase price for fire apparatus that had been ordered long before, only to be told that "if they did not agree to the price increase, the company would not deliver the truck."[55]

93. Manufacturer Defendants' price increases described above cannot be explained as simply passing increased input costs on to buyers. If the Manufacturer Defendants' price increases reflected cost pressure, their margins would have remained flat or compressed during the class period.

94. The opposite occurred. In 2024, for example, REV Group's profit margins on the segment that includes fire apparatus reached what the company itself described as an "exceptional 8.9 percent" in 2024.[56] Oshkosh's adjusted operating margins grew from 4.8 percent in 2022 to 10.5 percent in 2024, more than doubling, with Oshkosh telling investors it had delivered on a "key 2022 Investor Day targets one year early."[57]

---

[54] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIRE APPARATUS MAGAZINE (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain/.

[55] *See* Press Release, *supra* note 53.

[56] *See* Baker, Farrell & Kovaleski, *supra* note 10.

[57] *Investor Day*, OSHKOSH, 83 (June 5, 2025), https://online.flippingbook.com/view/29819025/3.

95. Oshkosh further told investors that it expects margins to grow to twelve to fourteen percent by 2028, with revenue projected to reach $13–14 billion, "supported by strong backlog" and price increases.[58] The simultaneous increase in price and margin forecloses any reasonable cost-pass-through explanation.

96. Manufacturer Defendants have treated their multi-year delivery delays as a financial advantage, rather than a competitive vulnerability. Such a posture is only available to firms that have ceased competing with one another. The effect of Defendants' anticompetitive conspiracy thus served to extract prices that a competitive market would not have produced from Plaintiff and buyers of fire apparatus—governmental entities funded by taxpayers.

### F. Defendants Concealed the Conspiracy

97. Plaintiff did not discover, and through the exercise of reasonable diligence could not have discovered, the existence of the conspiracy alleged herein until 2025 at the earliest, because Defendants conducted their conspiracy in secret and affirmatively concealed it from Plaintiff and the Class throughout the Class period. It was not until early 2025 that investigative reporting published in *The New York Times* and elsewhere revealed Defendants anticompetitive scheme. Before such reporting, Plaintiff reasonably believed that the fire apparatus industry was a competitive industry.

98. Defendants' conspiracy was self-concealing. The Manufacturer Defendants' collection and use of competitive information through Defendant FAMA was structured to be invisible to Plaintiff and other purchasers. FAMA's meetings, committees, members-only events, and other events were closed to non-members and the public. Manufacturer Defendants

---

[58] *Id.* at 87.

coordinated through a forum designed to or otherwise achieving the result that the very purchasers harmed by the coordination would have no means of observing it.

99.     Accordingly, the applicable statute of limitations for all Plaintiff's claims or rights of action have been tolled and Defendants should be estopped from asserting any statute of limitations as a defense due to their concealment of their unlawful and anticompetitive conspiracy.

## V.     CLASS ACTION ALLEGATIONS

100.     Plaintiff bring this action on their own behalf, and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

101.     Plaintiff seeks injunctive relief and damages pursuant to federal and state antitrust and consumer protection laws on behalf of the members of:

A. A Nationwide Class, including all local or municipal governmental entities in the United States that acquired fire apparatus manufactured by one or more of the Manufacturer Defendants between January 2016 and the present;

B. A New York Class, including all local or municipal governmental entities in New York State that acquired fire apparatus manufactured by one or more of the Manufacturer Defendants between January 2016 and the present.

102.     Excluded from these Classes are:

A. Any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families;

B. Each Defendant and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors;

C. Persons who properly execute and file a timely request for exclusion from any Class;

D. Persons whose claims in this matter have been finally adjudicated on the merits or otherwise released;

E. Counsel for Plaintiff and Defendants; and

F. The legal representatives, successors, and assigns of any such excluded persons.

103. Plaintiff reserves the right to modify or refine any of the Class definitions based upon discovery of new information and in order to accommodate any manageability concerns the Court may have.

104. **Numerosity – Rule 23(a)(1)**. The Class is so numerous that joinder of individual Members herein is impracticable. The exact number of Class Members, as herein identified and described, is not known, but on information and belief, there are hundreds if not thousands of local or municipal governmental entities in the United States that have purchased Defendants' products during the class period.

105. **Commonality – Rule 23(a)(2)**. Common questions of fact and law exist for each cause of action and predominate over any questions affecting only individual Class Members, including but not limited to:

A. Whether Defendants formed and adhered to an agreement to suppress fire apparatus output and to fix, raise, or stabilize fire apparatus prices in the United States;

B. The identity of the conspirators, the temporal scope of their agreement, and the overt acts by which the conspiracy was implemented and policed;

C. Whether Defendants' conduct substantially lessened competition in the relevant market;

D. Whether the information-sharing programs operated through FAMA together with direct interfirm communications among Defendants served to implement, enforce, and conceal their coordinated anticompetitive conduct;

E. Whether the Defendants collectively possess and have exercised market power within the relevant market sufficient to restrict output and to elevate prices above normal competitive levels;

F. Whether Defendants' conduct produced the anticompetitive market effects Plaintiff alleges, including severe increases in fire apparatus prices, lengthening of delivery backlogs, and whether those effects are attributable to the conspiracy rather than to inflation, supply-chain disruption, or other lawful causes;

G. Whether Plaintiff and Class members sustained antitrust injury in the form of artificially inflated prices paid for fire apparatus during the Class Period, increased delivery delays, and whether such injuries are susceptible to common, class-wide proof through accepted econometric methodologies;

H. The appropriate measure of damages owed to Plaintiff and the Class;

I. Whether Plaintiff and Class members are entitled to declaratory, injunctive, or other equitable relief, and the appropriate scope, terms, and duration of such relief; and

J. Whether Defendants' affirmative acts of concealment tolled the applicable limitations periods, and whether each sale of fire apparatus at an artificially

inflated price during the Class Period constituted a separately accruing violation that independently restarted those periods.

106. **Typicality – Rule 23(a)(3)**. Plaintiff's claims are typical of the claims of the other members of the proposed Class. Plaintiff and Class Members (as applicable) suffered anticompetitive harm and other injuries as a result of Defendants' wrongful conduct that is uniform across the Classes.

107. **Adequacy – Rule 23(a)(4)**. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest that is antagonistic to those of either the Nationwide or New York Classes, and Defendants have no defenses unique to Plaintiff. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of Class Members, and they have the resources to do so. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other Class Members.

108. **Ascertainability**. The proposed Class is readily ascertainable because they are defined using objective criteria so as to allow Class Members to determine if they are part of a Class. Further, the Class can be identified through records maintained by Defendant.

109. **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all Class Members is impracticable. The prosecution of separate actions by individual Class Members would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to Class Members, and would be dispositive of the interests of the other Class Members not parties to the individual adjudications or would substantially impair or impede their ability to

protect their interests. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

110. Class certification, therefore, is appropriate under Federal Rule of Civil Procedure 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

111. Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief, if any, that may be awarded by the Court is appropriate as to the Class as a whole.

112. Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## VI.  CLAIMS FOR RELIEF

### COUNT ONE — VIOLATION OF THE SHERMAN ACT – CONSPIRACY TO RESTRAIN PRODUCTION AND FIX PRICES

*Against all Defendants by Plaintiff on behalf of the Nationwide Class*

113. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

114. From January 2016 through the present, Defendants maintained an unlawful agreement to suppress the output of fire apparatus and elevate the prices at which fire apparatus are sold in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

115. The Fire Apparatus Manufacturers' Association is a participant in and vehicle for perpetuating that agreement: FAMA serves as the principal venue through which the Manufacturer Defendants share competitively sensitive information about one another's sales, orders, and capacity, monitor each participant's adherence to the coordinated arrangement, and meet privately to align their conduct on output and price.

116. Plaintiff and other Class Members have been injured and will continue to be injured by paying more for fire trucks from Manufacturer Defendants than they would have paid and will pay in the absence of the combination and conspiracy.

117. Plaintiff and other Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT TWO — VIOLATION OF THE SHERMAN ACT – EXCHANGE OF COMPETITIVE INFORMATION

*Against all Defendants by Plaintiff on behalf of the Nationwide Class*

118. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

119. Beginning no later than January 2016 and continuing through the present, the Manufacturer Defendants, through and with Defendant FAMA, entered into and maintained an agreement to exchange among themselves, on a recurring basis, current and highly granular member-specific data.

120. Defendants' agreement to exchange such competitively sensitive data has the effect of an unreasonable restraint of trade. The exchange occurs in a highly concentrated market; the data exchanged is current and is shared exclusively among horizontal competitors and categorically withheld from buyers; the exchange is reciprocal and enforced by FAMA's terms;

and the exchange is paired with regular closed-door meetings of senior personnel from each Manufacturer Defendant, their subsidiaries, or corporate affiliates.

121. Defendants' exchange of their competitively sensitive data has reduced the competitive uncertainty the Manufacturer Defendants would otherwise face and has been a material factor in the parallel pricing, output, and capacity decisions. Such decisions have had the effect of suppressing competition in the fire apparatus market in the United States and artificially inflating the price of such apparatus during the Class period. No procompetitive justification outweighs these effects.

122. Defendants' anticompetitive agreement and conduct is ongoing. Without judicial intervention, the Manufacturer Defendants will continue to exchange competitively sensitive information through FAMA, and Plaintiff and those similarly situated will continue to be harmed by being forced to pay artificially inflated prices for fire apparatus.

123. Plaintiff and the Class are entitled to injunctive and equitable relief, and any further equitable relief as the Court deems appropriate.

## COUNT THREE — VIOLATION OF NEW YORK GENERAL BUSINESS LAWS § 340

*Against all Defendants by Plaintiff on behalf of the New York Class*

124. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

125. Plaintiff the City of Rochester purchased fire apparatus manufactured by Defendants in New York State during the Class period. But for Defendants' unlawful and anticompetitive conduct, the price of those fire apparatus would have been lower. Each purchase was made at prices inflated by Defendants' conspiracy, and/or unreasonably delayed by Defendants' conspiracy, to the detriment of Plaintiff.

126. Defendants' conspiracy had the following effects: (1) fire apparatus price competition was restrained, suppressed, and eliminated throughout New York; and (2) fire apparatus prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York State.

127. Defendants' illegal conduct substantially affected commerce in New York State. Defendants' conduct is a *per se* violation of the Donnelly Act, § 340, *et seq*. Plaintiff the City of Rochester and members of the New York Class were injured with respect to purchases of fire apparatus in New York State and are entitled to all relief available under New York General Business Laws § 340, *et seq*.

## COUNT FOUR — UNJUST ENRICHMENT

*Against Manufacturer Defendants on behalf of the New York Class*

128. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

129. By virtue of their unlawful and anticompetitive conduct alleged herein, Manufacturer Defendants have realized millions of dollars in revenue.

130. Manufacturer Defendants' ill-gotten gains were monetary benefits. It would be inequitable and unjust to permit Manufacturer Defendants to retain such benefits obtained through their unlawful anticompetitive practices as alleged herein. Manufacturer Defendants would be unjustly enriched if they are permitted to retain such ill-gotten gains.

131. Plaintiff and Class Members have no adequate remedy at law to divest Manufacturer Defendants of their ill-gotten and unjust profits.

132. Pursuit of any remedies against the firms from which Plaintiff and Class Members purchased fire apparatus subject to Defendants' anticompetitive conspiracy would have been futile.

133. Plaintiff and Class Members are therefore entitled to recover the amounts realized by Manufacturer Defendants at their expense.

134. To the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, Plaintiff and Class Members assert their claim for disgorgement as an alternative remedy and/or the imposition of a constructive trust to recover the amount of Manufacturer Defendants' ill-gotten gains from which Plaintiff and Class Members may make claims.

## VII. PRAYER FOR RELIEF

135. WHEREFORE, Plaintiff seeks that this matter be certified as a class action, that their attorneys be appointed Class Counsel, and that they be appointed Class Representatives.

136. Plaintiff and Class Members seek the following relief against Defendants:

    A. Actual damages and other compensatory relief in an amount to be determined at trial;

    B. Statutory and treble damages as authorized by law, including under 15 U.S.C. § 15, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26, and New York General Business Laws § 340;

    C. Restitution and disgorgement of profits and other unjust gains obtained through the conduct alleged herein;

    D. Injunctive and equitable relief to prevent Defendants from continuing the unlawful, unfair, and deceptive practices described in this Complaint;

    E. Reasonable attorneys' fees, costs, and expenses as permitted by law;

F. Pre- and post-judgment interest as allowed by law; and

G. Any other relief the Court deems just and proper under the circumstances.

## VIII. DEMAND FOR JURY TRIAL

137. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial for all claims so triable.

Respectfully submitted,

DATED: May 8, 2026

KELLER ROHRBACK L.L.P.

By *s/ Gretchen Freeman Cappio*
Gretchen Freeman Cappio
Ryan McDevitt
Garrett Heilman
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com
gheilman@kellerrohrback.com
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384